Milligan, J.,
delivered tbe opinion of tbe court:
This action is prosecuted in tbe name of Solomon Outner for tbe use of Samuel Scbiffer, surviving partner of tbe firm of J. Scbiffer & Oo., to recover tbe net proceeds of thirty bales of cotton; and we find tbe facts to be:
1. Solomon Outner, tbe nominal claimant, is a native subject of tbe kingdom of Prussia; but be bas been regularly naturalized and admitted to citizenship in tbe United States. He resided and did business as a merchant during tbe war at tbe little town of Blackshire, on tbe Atlantic and Gulf Bailroad, in tbe State of Georgia.
2. Samuel Scbiffer, for whose use this suit is prosecuted, is tbe sole surviving partner of tbe mercantile firm of “ J. Scbif-fer & Oo.,” of tbe city of New York, where their business bouse was located and all tbe partners resided.
3. Tbe nominal claimant, Outner, bought tbe cotton in question, twenty-nine bales sea-island and one of upland, while be was resident in Blackshire, and shipped it down to Savannah, where it was stored at No. 171 Congress street.
4. Tbe city of Savannah was captured by General Sherman on tbe 21st of December, 18C4, and oil or about tbe 23d of February, 1865, Outner reported tbe cotton claimed in this action, which was registered by the Treasury agents in bis name as reported of that date, and on tbe 3d of March following it was taken into tbe custody of tbe United States Treasury agents and removed from the place where it was stored on Congress street to tbe government cotton-press in Savannah, and thence shipped to New York and there sold by the United States cotton agent, and tbe net proceeds, amounting to $6,897 24, paid into the treasury.
5. Thereafter, on the 6th of March, 1865, tbe claimant, Out-ner, executed to “ J. Scbiffer & Co.” the following bill of sale, • viz:
Know all men by these presents, that I, Solomon Outner, of the city of Savannah, State of Georgia, of tbe first part, for and in consideration of the sum of $2,250, lawful money of the United States, to me in -hand paid at or before the ensealing and delivery of,these presents, by J. Scbiffer & Oo., of the city *417 of New York, of tbe second part, tlie receipt whereof is hereby-acknowledged, have bargained and sold, and by these presents do grant and convey unto the said.parties of the second part, their executors, administrators, and assigns, all that certain lot and quantity of cotton, viz., thirty bales of cotton, twenty-nine of which are sea-island, and one upland, ail marked “ S. C.,” being the same as described in my petition to the President of the United States, dated March 6, 1865, and ’ also in my power of attorney given to Joseph B. Stewart, dated March 1,1865, and my said attorney is hereby authorized to pay over the proceeds of same to J. Schiffer & Co., and any and all proceeds which may arise from same, when sold in market or otherwise j to have and to hold the same unto the said parties of the second part, their executors, administrators, and assigns forever. And I do, for me and my heirs, executors, and administrators, covenant and agree, to and with the said party of the second part, to warrant and defend the sale of the said thirty bales of cotton, hereby sold unto the said parties of the second part, their heirs, executors, administrators, and assigns, against all and every person and persons whomsoever.
In witness whereof I have hereunto set my hand and seal •the 6th day of March, in the year 1865.
[seal.] SOLOMON CUTNEB.
Sealed and delivered in the presence of—
A. J. Brady,
Chas. Center.
6. In dejiendent of this contract of purchase, or bill of sale, it appears that the consideration, $2,250, was paid by one J. B. Stewart, the attorney and agent of J. Schiffer & Go., to Cutner, at the date of the contract of sale.
7. J. Schiffer & Co. exhibit no license or permit from the President of the United States, under the Secretary of the Treasury, to purchase the cotton in questiou.
' 8. The loyalty of the nominal claimant, Cutner, is reasonably well proven, and that of the real claimant, as well as the firm he represents, satisfactorily established.
On these facts, it is obvious that Solomon Cutner, the nominal claimant, has no beneficial interest in this action. He claims none, and has no control over the case. The real claimant is Samuel Schiffer, the sole surviving partner of the firm of *418 J. Seliiffer & -Go., of New York. Dealing with the case in. this light, we are met at the threshold with the question of lawful power in the firm of J. Schiffer & Go., either by its own act or through an agent, to clothe itself with the title to the cotton in question, or the proceeds thereof, sought to be recovered in this action.
To say nothing of the fact that the cotton was actually seized and under the control of the United States at the time of the transfer by Outner to the claimant’s firm, the Act 13th July, 1861, and the proclamations of the President thereunder, interpose a serious obstacle in the way of a recovery. The fifth section of this act, providing for the collection of duties and for other purposes, empowered the President, under certain conditions, to declare the inhabitants of a State, or any section or part thereof, to be “in a state of insurrection against the United States,” and it enacts that thereupon “ all commercial intercourse by and between the same and the citizens thereof, and the citizens of the rest of the United States, shall cease and be unlawful so long as such condition of hostility shall continue. * * * Provided, however, That the President may, in his discretion, license and permit commercial intercourse with any such part of such State, the inhabitants whereof are so declared in a state of insurrection, in such articles and for such time and by such persons as he, in his discretion, may think most conducive to the public interest ; and such intercourse, so far as by him licensed, shall be conducted and carried on only in pursuance' of rules and regulations prescribed by the Secretary of the Treasury.”
On the 16th of August, 1861, the President issued a proclamation declaring the rebel States, including the State of Georgia, in which this transaction occurred, to be in a state of insurrection. This proclamation excepted several localities,, among which were such parts of the States mentioned “ as may be from time to time occupied and controlled by forces of the United States engaged in the dispersion of the insurgents.” Experience having proved that the exceptions made by this proclamation embarrassed the due enforcement of the Act 13th July, 1861, and the proper regulation of commercial intercourse authorized by it, the President, on the 2d of April, 1863, issued another proclamation, in which he declared the same States to be in insurrection, and revoked all the exceptions contained in *419 the former proclamation-; but again made certain local exceptions therein mentioned. By the last proclamation it is declared . “ that all commercial intercourse not licensed and conducted as is provided in said act, between the said States and the inhabitants thereof, with the exceptions aforesaid, is unlawful, and will remain unlawful until such insurrection shall cease or has been suppressed, and notice thereof has been given by proclamation.”
It is true, at the time of the pretended transfer of the cotton involved in this action, or the claim for its proceeds, the city of Savannah was occupied by the United States military forces. That occupation was not temporary, or illusory, but permanent, and from that time, in the words of the Supreme Court in the case of the Ouachita Cotton, (G Wall. B., 531,) “its citizens were clothed with the same rights of property, and were subject to the same inhibitions and disabilities as to commercial intercourse with the territory declared to be in insurrection as the inhabitants of the loyal States. Such is the result of the application of well-settled principles of public law. The proclamation of the 2d of April, 1863, recognized„but did not change the existing condition of things. It .was the same afterward as before. The effect of the proclamation was cumulative.” See The Venice, (2 Wall. B., 258.)
In the Ouachita Cotton Case the court further say : “ The language of the act of 1861, and of the proclamation of 1863, is clear and explicit. There ife no room to doubt as to their meaning, nor as to their effect in these cases. Commercial intercourse between the inhabitants of territory in insurrection-and those of territory not in insurrection, except under the license of the'President, and according to regulations prescribed by the Secretary of the Treasury, was entirely prohibited. * * Prohibition was the rule and license the exception.”
Thus the law stood up to the 2d of July, 1864, when an act in addition to the several acts concerning commercial intercourse between loyal and .insurrectionary States was -passed. The fourth section of this act (13 Stat. L., p. 376) declares that “the prohibitions and provisions of the Actl3th July, 1861, and of the acts amendatory or supplementary thereto, shall apply to all commercial intercourse by and between persons residing or living loiihin districts within the present or future lines of national military occupation in the States or parts of States declared injnsur- *420 rcotion, whether with each other, or with persons residing or being within districts declared in insurrection and not within * those lines; and that all persons within the United States, not natives or naturalized citizens thereof, shall bo subject to the same prohibitions, in all commercial intercourse with inhabitants of States or parts of States declared in insurrection, as citizens of loyal States are subject to under the said act or acts.”
The 9th section of this act repeals so much of the 5th section of the Act 13th July, 1861, as authorizes the President, in his discretion, to license commercial intercourse in any State or section the inhabitants of which are declared in insurrection, except so far as may be necessary to authorize supplying the necessities of loyal persons residing in insurrectionary States within the lines of actual occupation by the military forces of the United States, as indicated by published order of the commanding general of the depártment or district occupied; and also, except so far as may be necessary to authorize persons within such lines, to bring or send to market in the loyal States any products which they shall have produced with their own labor or the labor of freedmen, or others employed or paid by them, pursuant to rules relating thereto, which may be established under proper authority.
But neither of these sections of the act of 1801 removed the prohibitions imposed upon commercial intercourse by the act of 1861 and the President’s proclamation of the 2d of April, 1863. They remained as theretofore, except they were made more stringent, and, by express enactment, declared to extend to States or parts of States within the lines of present or future military occupation. The power of the President to license or permit trade between the inhabitants of the loyal and insurrectionary States was taken away by the 9th section, except in the limited and restricted sense therein prescribed.
Applying the law as it existed at the date of the real claimant’s pretended purchase of the cotton involved in this suit, it is clear there can be no recovery. The firm of J. Schiffcr & Oo., for whose use this action is prosecuted, had their business house in New York, and the'cotton was in an insurrectionary State. All commercial intercourse between the inhabitants of the two States was cut off, and absolutely unlawful. The President, at that time, (March 6, 1865,) had no power to authorize it, had he attempted to do so, and the pretended purchase, *421 whetber we regard it as a purchase of the cotton or of the claim for its proceeds, was an absolute nullity, and communicated no title to the claimant, and therefore the petition must be dismissed.